VLASIC FOODS INTERNATIONAL, APPELLANT, V.
FERNANDO LECUONA III, COMMISSIONER OF LABOR,
STATE OF NEBRASKA, ET AL., APPELLEES.

618 N.W. 2d 403

Filed September 22, 2000.   No. S-99-765.

Timothy D. Loudon and David D. Gale, of Berens & Tate, P.C., for appellant.

Thomas F. Dowd, of Dowd & Dowd, for appellees United Food and Commercial Workers Local 271.

John F. Sheaff and John H. Albin for appellee Fernando Lecuona III.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Vlasic Foods International (Vlasic) appeals from a district court order affirming an appeal tribunal decision which sustained a grant of unemployment insurance benefits for Vlasic employees who were required to take vacation during an annual shutdown. We conclude that employees who agree to take their vacation at a specific time, with the expectation of continued employment, are not unemployed under Nebraska's Employment Security Law, Neb. Rev. Stat. §§ 48-601 to 48-671 (Reissue 1998 & Supp. 1999). Accordingly, we reverse, and remand with directions to vacate the district court's affirmance of the Nebraska Appeal Tribunal's grant of unemployment benefits.

## FACTS

Vlasic is a food manufacturing corporation located in Omaha, Nebraska. Before 1998, the company had been one of the Campbell Soup Company (Campbell) food lines. In March 1998, Campbell formed an independent company out of the Vlasic line, and Vlasic retained the same employees and assumed the current collective bargaining agreement (CBA) negotiated between Campbell and United Food and Commercial Workers Local 271 (Local 271), the union that represented 688 of the 691 claimants in this case. Local 271 had been the employees' bargaining representative since at least 1972, and each CBA since 1972 had given the employer the right to call

for a vacation shutdown within a fixed time period during the summer.

Three of the claimants were salaried employees in the quality assurance department who were required to take vacation during most of the shutdown because of the interdependence between their jobs and the production process. This requirement had been Vlasic's standing policy in regard to these salaried employees' vacation leave for the entire 26 years during which the bargaining agreements had provided for shutdowns, and these employees were informed of the policy upon hiring. Vlasic's written vacation policy also reserved the right to assign vacation leaves based on Vlasic's business needs.

Unsalaried employees in the bargaining unit earned vacation hours on a monthly basis, with the number of hours earned dependent upon the employee's years of service. Employees with at least 1 year of seniority were entitled to their vacation upon termination or retirement. Vlasic required employees with only 1 to 2 weeks of earned vacation to take their vacation during the annual vacation shutdown, and if such an employee requested a vacation before the shutdown, the request would be denied. Vlasic's policy was the same for salaried employees required to work during shutdown. If one of these employees occasionally exhausted his or her vacation leave before the shutdown or had not worked for the company long enough to earn sufficient vacation hours, the employee was considered laid off for the period of time he or she was not entitled to vacation pay during the shutdown. Laid off employees commonly applied for and received unemployment benefits.

Vlasic did allow some groups of employees to work during the shutdown to assist with cleaning, maintenance, and construction. First priority was given to employees with special skills or licenses which were needed during this time. After that, priority went to those employees without earned vacation at the time of shutdown. If still more employees were needed during shutdown, final priority went to the interested employees with the most seniority. Special notice for the 1998 shutdown was posted toward the end of December 1997.

In 1998, the shutdown was held from Sunday, June 21, to Monday, July 6 (10 vacation days plus 1 holiday). All employ-

ees received full payment for vacation used during the shutdown on the Thursday before the shutdown, and all employees were automatically reinstated at the end of the shutdown period.

During the 1998 shutdown, 688 bargaining unit employees and the 3 salaried employees from quality assurance applied for and were awarded unemployment insurance benefits. The approximate cost to Vlasic for these benefits was $195,000. Before 1998, employees with sufficient vacation pay for the shutdown had never been eligible for unemployment benefits. In 1998, however, the claims deputy's determinations stated that "[t]he Supreme Court has recently held that wages are attributable to the week earned rather than [the week] paid."

Vlasic appealed the claims deputy's grant of benefits to the claimants to the Nebraska Appeal Tribunal, which sustained the award based on its finding that *Board of Regents v. Pinzon*, 254 Neb. 145, 575 N.W.2d 365 (1998), was controlling. Vlasic then filed a petition for review in the district court, which court affirmed the appeal tribunal's decision. Vlasic timely appealed from that order.

## ASSIGNMENTS OF ERROR

Vlasic assigns that the district court erred in affirming the appeal tribunal's decision allowing the claimants to receive benefits by erroneously applying this court's decision in *Board of Regents v. Pinzon, supra*, and by finding that vacations taken as a result of the plant shutdown were exempt leaves of absence under the Employment Security Law.

## STANDARD OF REVIEW

■ In an appeal from the Nebraska Appeal Tribunal to the district court regarding unemployment benefits, the district court conducts the review de novo on the record. *Lancaster Cty. Sch. Dist. No. 0001 v. State, ante* p. 108, 615 N.W.2d 441 (2000); *Board of Regents v. Pinzon, supra*.

■ Neb. Rev. Stat. § 84-918(1) and (3) (Reissue 1999) provides that judgments issued by a district court on a petition for review under the Administrative Procedure Act may be appealed to the Court of Appeals under general civil procedure rules. The decision in the district court may be reversed, vacated, or modified by an appellate court for errors appearing on the record.

*Lancaster Cty. Sch. Dist. No. 0001 v. State, supra*; *Lackawanna Leather Co. v. Nebraska Dept. of Rev.*, 259 Neb. 100, 608 N.W.2d 177 (2000). The inquiry on appeal, however, is limited to whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. See, *Lancaster Cty. Sch. Dist. No. 0001 v. State, supra*; *Lackawanna Leather Co. v. Nebraska Dept. of Rev., supra*.

An appellate court, in reviewing a district court judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. *A & D Tech. Supply Co. v. Nebraska Dept. of Revenue*, 259 Neb. 24, 607 N.W.2d 857 (2000); *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999). An appellate court nonetheless has an obligation to resolve questions of law independently of the conclusion reached by the trial court when reviewing a decision for errors appearing on the record. *Lackawanna Leather Co. v. Nebraska Dept. of Rev., supra*; *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 606 N.W.2d 786 (2000).

## ANALYSIS

We note in passing that this is a case of last impression. The Nebraska Legislature has since amended the Employment Security Law to specifically preclude employees on a paid vacation from receiving benefits under this law and to allocate vacation pay to the week in which it is received, either during employment or following separation from employment. See § 48-602(18) and (25) (Supp. 1999).

Vlasic asserts on appeal that *Board of Regents v. Pinzon*, 254 Neb. 145, 575 N.W.2d 365 (1998), is not applicable to the facts of this case and that therefore, these claimants were not unemployed under § 48-602 (Reissue 1998). Fernando Lecuona, the Commissioner of Labor of the State of Nebraska (Commissioner), argues that *Pinzon* is applicable to paid vacation leaves.

Vlasic and its predecessor, Campbell, had the right to call for a vacation shutdown for at least 26 years under their successive CBA's with Local 271. The language of the CBA in effect in 1998 was typical:

> 10.3 Vacations shall be taken at such time as fixed by management. The Company shall provide a vacation shutdown period during the period June 15 to August 31. Any employee scheduled off during the shutdown period on a day when he is not entitled to vacation pay will be considered in a layoff status.

Campbell had also enforced the vacation shutdown against salaried employees in the quality assurance department for these 26 years, which employees were notified of the policy orally upon employment and through a written vacation policy that allowed management to assign vacation leaves in a way that did not conflict with Campbell's business needs. None of the salaried or bargaining unit employees with sufficient vacation leave had been eligible for unemployment benefits before 1998. However, the Commissioner now argues that *Board of Regents v. Pinzon, supra,* has changed that result by making paid vacation attributable to the weeks in which it is earned, not the weeks in which it is paid.

Section 48-602(24) (Reissue 1998) provides that an individual is unemployed "during any week in which the individual performs no service and with respect to which no wages are payable." We determined in *Pinzon* that this language required two elements to be met in order to show a claimant was unemployed: "First, the individual must not perform any services for the weeks in question; and second, no wages may be payable with respect to the time period the individual performed no services." 254 Neb. at 148, 575 N.W.2d at 367.

In *Pinzon,* the University of Nebraska did not renew the teaching contract of an untenured assistant professor at the end of the spring term of the 1994-95 school year. In July 1995, after the professor had completed all of his duties under his yearly contract, he applied for unemployment benefits. The district court determined that the professor was not entitled to unemployment insurance benefits during the summer for the period of time the university was paying him. Under these facts, we agreed with the professor that he was unemployed because his wages were paid " 'with respect to' " the 9 months he actually worked for the university, not the summer months in which the wages were received. *Id.* at 148, 575 N.W.2d at 368.

*Board of Regents v. Pinzon*, 254 Neb. 145, 575 N.W.2d 365 (1998), addressed the effect of deferred base wages on a claimant's eligibility for unemployment benefits when that claimant has been permanently separated from his or her employment. Every case we cited and relied on for holding that the claimant's wages were payable when earned involved an employee's eligibility for unemployment insurance benefits *after* the employment relationship had been severed. See, *Meyer v. Employment Appeal Bd.*, 441 N.W.2d 766 (Iowa 1989) (holding that unemployed community college instructor's deferred wages for services already performed were payable to her when earned and did not disqualify her from claiming unemployment benefits during summer months after her employment had been terminated); *Southwestern Bell Telephone Co. v. Employment Security Board of Review*, 189 Kan. 600, 371 P.2d 134 (1962) (refusing to find that contracting parties intended negotiated termination allowance to be wages for weeks following termination when amount of allowance was wholly computed in relation to employee's years of service); *South Hadley v. Director of the Division of Employment Security*, 389 Mass. 399, 450 N.E.2d 596 (1983) (holding that all of public school teacher's wages were earned when she concluded her duties and that she was therefore eligible for unemployment insurance benefits after that time when she had no reasonable assurance of working in next school year); *State, Dept. of Indus. Relations v. Deslattes*, 372 So. 2d 867 (Ala. Civ. App. 1979) (holding that employer's voluntary payment of lump-sum termination allowances did not constitute wages that would disqualify employees for unemployment insurance benefits and that even if such allowances could be considered wages, they could not be allocated to weeks following separation from employment absent specific provision in employment contract).

In *Board of Regents v. Pinzon, supra*, we were concerned that our holding regarding the claimant professor's unemployment status should be in agreement with § 48-628(h)(1) (Cum. Supp. 1994), which prohibited "teachers from receiving unemployment compensation benefits during the summer months when a 'reasonable assurance' exists that they will be teaching in the following academic year." 254 Neb. at 149, 575 N.W.2d at 368.

We noted that the statute implies that where no such reasonable assurance exists, "an inference can be drawn that unemployment benefits may be obtained during the summer months." *Id.* Under the plain reading of this statute, the determination of when the professor's wages in *Pinzon* were paid was contingent upon an initial finding that the professor had no reasonable assurance of continued employment.

In this case, the statutory restrictions at play in *Pinzon* are not relevant. Nonetheless, the facts in this case are distinguishable in that the result in *Pinzon* was dependent upon the claimant's severed employment relationship. In contrast, the employees in this case have simply agreed to apply vacation wages to a shut-down period in order to facilitate a continuous stream of income during a necessary break in production each year. As such, they were not unemployed under § 48-602(24) and not entitled to unemployment benefits.

## CONCLUSION

■ We conclude the district court's judgment did not conform to the law because *Board of Regents v. Pinzon*, 254 Neb. 145, 575 N.W.2d 365 (1998), does not apply to circumstances where employees agree to take their earned vacation at a specific time for the employer's convenience under the expectation that their employment will continue after that period. Therefore, these employees were not unemployed under § 48-602(24), and we reverse the judgment of the district court and remand the cause with directions to vacate.

REVERSED AND REMANDED WITH DIRECTIONS.